UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHY ST.CLAIR-SEARS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-52 |
| | § | |
| LIFECHEK STAFF SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Pending before the Court are the defendant's, Lifechek Staff Services, Inc., ("Lifechek"), motion for summary judgment (Docket No. 29), the plaintiff's, Kathy St. Clair-Sears (the "plaintiff"), response (Docket No. 43), and Lifechek's reply (Docket No. 60).  Having carefully reviewed the parties' submissions, the record and the applicable law, the Court hereby GRANTS Lifechek's motion for summary judgment.[1]

### II.    FACTUAL BACKGROUND

The plaintiff was hired by Lifechek in September of 2009 as a pharmacy clerk.  She claims that she was sexually harassed by her supervisor, store manager Bob Byrnes.  According to the plaintiff: (1) one time when she was in the back of the store, Byrnes "basically sat on top" of her, rubbed her back, and asked her out on a date; (2) while she was behind the store counter, Byrnes rubbed up against her and placed his hand on her "butt;" and (3) on one occasion, Byrnes stood so close that the plaintiff felt his erection.

---

[1]Lifechek has filed separate motions with respect to each plaintiff and the plaintiffs have filed separate responses. Therefore, the Court will issue separate decisions.

The plaintiff also asserts that Byrnes sent her six notes.  In one note, Byrnes said, "Good morning.  Hope you had a nice weekend.  At least know I thought about you."  In another note, Byrnes said, "Good morning.  So what are they saying about us?  I'm hardly even around you.  So I can't figure why they would say anything.  Do you want us to go out still?  Are you even attracted to me?  You did right to deny what they say.  If you want us to be together, don't bother with their drama."  In the other notes, which the plaintiff has not produced because she threw them away, Byrnes said, *inter alia*, "did you sleep ok?  I hope you slept ok;" "I sure wish you'd come see me;"  "How do you feel about me?"  "I miss you when you are gone."  The plaintiff acknowledges that she threw away those notes because they were "stupid" and dealt with "just juvenile stuff that you did in high school."

According to the plaintiff, Byrnes also asked her out to Fajita Jacks several times to which she responded, "Whatever.  We'll see."  The plaintiff alleges that on one occasion, Byrnes said to her, "Hey, since you're doing your college thing, I have Internet.  You could come over on a Friday night since you don't have to work on a Saturday."  She told Byrnes that she could not leave her dogs alone.  The plaintiff states that, initially, she was polite in responding to Byrnes, but around Halloween of 2009, she told Byrnes, "I don't want what you want, no!"  She also told Byrnes that she had "other priorities in [her] life" and dating was not one of them.  The plaintiff admits that after she made it clear to Byrnes that she was not interested in him, he stopped his advances and sent her no more notes.[2]

---

[2]The plaintiff claims that after she rejected Byrnes, he began treating her poorly.  She alleges that Byrnes became visibly angry with her, gave her "ugly" looks, refused to speak to her directly, began cutting her hours and making "snide" comments in her presence.  She also claims that Byrnes made comments such as, "I don't want her to have more than 20 hours," Hopefully, she will quit," and "who knows what she does for sex."  She further asserts that Byrnes told her he wished she did not work there because he would probably have another employee there that he could see.  The plaintiff also alleges that some of her co-workers started making "snide" remarks to her.

On December 24, 2009, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, alleging sexual harassment and retaliation.[3]   Lifechek learned of the EEOC charge in January of 2010 and an investigation was conducted by corporate trainer Sandra Scott and Scott Younker, Director of Operations.   The plaintiff asserts that during the initial meeting with her, Scott remarked, "I don't remember having anybody file an EEOC charge and still work here."   She also alleges that she was "informed by Scott [Younker] about how much this was going to cost and why don't I just drop all of this and they'll take care of it."   The plaintiff also asserts that Amanda Ward, a co-worker, overheard Amber Klawinsky, a technician, tell Tina Walker, the head technician, that the plaintiff may get fired because of her EEOC complaint.

During the investigation, Byrnes admitted that he had sent the notes asking the plaintiff out, but said he did that because another employee had told him that the plaintiff was interested in him. Byrnes also stated that he stopped asking the plaintiff out when he learned that she was not interested in him.   On January 12, 2010, as a result of the investigation, Byrnes was given a written reprimand for breaking company policy on fraternization and he was warned that any other violations would result in further disciplinary action, including termination.   Byrnes was also directed not to retaliate against the plaintiff.   On February 17, 2010, Byrnes was terminated, not based on the allegations made by the plaintiff, but because of the allegations made by Norma Todd, another plaintiff in this case.[4]

---

[3]The plaintiff amended her EEOC charge on April 19, 2010, to include claims of retaliation that she allegedly experienced after filing her initial charge.  On August 5, 2010, she filed another EEOC charge, alleging disability discrimination and retaliation.

[4]Todd's claims are addressed in a separate decision.

The plaintiff claims that after she filed her initial charge of discrimination, she was retaliated against.  She specifically alleges that her hours were reduced, other employees "began freezing her out" and not speaking to her, and she was blamed or reprimanded for conduct that was not her fault.

The plaintiff was given several write-ups primarily for cash register shortages, before and after Lifechek learned of her EEOC charge.[5]  In a write-up from March 30, 2010, the plaintiff was warned that, due to the number of written warnings she had received, she would be suspended if she had another write-up for cash register mistakes.  On December 6, 2010, the plaintiff received her seventh written warning for cash register shortage.  She was suspended for one day and warned that the next incident would result in suspension or termination.  On December 24, 2010, the plaintiff received a warning for cash register shortage and was suspended for three days.  On January 27, 2011, she received another written warning and was suspended for three days, pending a review of her performance history and employment status.  On January 31, 2011, the plaintiff was terminated because of her repeated cash register errors and procedure violations.

The plaintiff asserts that Lifechek created a paper trail (the write-ups) in an effort to terminate her in retaliation for her filing the EEOC charge and she is now disputing some of the write-ups.  She also alleges that management instructed other employees to be alert to everything she was doing in the store and instructed her co-worker, Amanda Ward, to only write-up the plaintiff (and not other employees) and management also forced Ward to give the plaintiff a

---

[5]The write-ups are from March 18 and 30, 2010; June 19, 2010; August 16, 2010; December 6, and 24, 2010; and January 27, 2011.  In December of 2009, before Lifechek learned of the plaintiff's EEOC charge, she was given two write-ups, one for cash register shortage and the other for engaging in a confrontation with a customer.  She acknowledges that she signed both warnings and did not dispute them.

write-up for a minor mistake. The plaintiff admits, however, that she signed all the write-ups and did not check the box on the write-ups stating that she disagreed with them.

The plaintiff filed the instant suit, alleging sexual harassment, retaliation, and defamation in violation of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act.

## III.   CONTENTIONS OF THE PARTIES

### A.   Lifechek's Contentions

Lifechek argues that the plaintiff's sexual harassment claim fails as a matter of law because she cannot prove the fourth element of a hostile work environment, *i.e.*, that the alleged harassment affected a term, condition, or privilege of her employment. Lifechek specifically claims that the alleged harassment did not rise to the level of severity or pervasiveness required by law.

Similarly, Lifechek contends that the retaliation claim fails because the plaintiff cannot establish a causal connection between the protected activity and the adverse employment action. Specifically, Lifechek argues that the plaintiff was terminated because she was a careless employee as evidenced by the numerous performance warnings that she received.

Lifechek also argues that the plaintiff's defamation claim fails as a matter of law because she cannot prove that Lifechek published a defamatory statement about her to a third party.

### B.   The Plaintiff's Contentions

The plaintiff argues that she has established a hostile work environment because the sexual harassment she experienced was not isolated, but occurred on a regular basis.

The plaintiff also argues that her retaliation claim should proceed because she has established, *inter alia*, that management made negative comments about her EEOC charge and instructed her supervisor to only write her up, her hours were reduced, other employees "began

freezing her out" and not speaking to her, and the company created a paper trail, in the form of several reprimands, in order to terminate her.   The plaintiff has not addressed Lifechek's argument that her defamation claim fails as a matter of law.

### IV.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c).   "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact." *Lynch Props., Inc. v. Potomac Ins. Co*., 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322–25 (1986).   Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.   *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).   The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).   The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts.   FED. R. CIV. P. 56(e).   "[T]he substantive law will identify which facts are material."   *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists."   *Lynch*, 140 F.3d at 625.   "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party."   *Roberson v. Alltel Info. Servs*., 373 F.3d 647, 651 (5th Cir.

2004).   Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251–52).

## V.    ANALYSIS AND DISCUSSION

Under the Civil Rights Act of 1964 ("Title VII"), it "shall be . . . unlawful . . . for an employer . . . to discharge any individual or otherwise to discriminate . . . with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Similarly, under the Texas Commission on Human Rights Act ("TCHRA"), it is unlawful for an employer to engage in sexual harassment and/or retaliate against an employee based on sex.  *See* Tex. Lab. Code §§ 21.051; 21.055.  The legal analysis for Title VII and TCHRA claims are identical and, therefore, the courts apply the legal standards developed by the federal courts to resolve the claims.  *See Reed v. Neopost USA, Inc*., 701 F.3d 434, 439 (5th Cir. 2012); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010).

## A.    Sexual Harassment.

To establish a hostile work environment, the plaintiff must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a "term, condition, or privilege" of employment.  *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009).

In this case, Lifechek does not dispute that the plaintiff can satisfy the first three elements.  Lifechek argues, however, that the plaintiff cannot establish the fourth element, *i.e*., that the alleged harassment affected a "term, condition, or privilege" of her employment.  The

Court agrees that the plaintiff has failed to satisfy the fourth element because the alleged conduct at issue was not sufficiently severe or pervasive as required by law.

To affect a term, condition, or privilege of employment, "sexual harassment must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Stewart*, 586 F.3d at 330 (citations omitted). "A recurring point in [Supreme Court] opinions is that . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999). To determine whether conduct is severe or pervasive, the Court should look at the totality of the circumstances. *See Stewart*, 586 F.3d at 330. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Finally, to be actionable, the challenged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd*, 168 F.3d at 874.

In this case, the plaintiff claims that: (1) one time when she was in the back of the store, Byrnes "basically sat on top" of her, rubbed her back, and asked her out on a date; (2) while she was behind the store counter, Byrnes rubbed up against her and placed his hand on her "butt;" (3) on one occasion, Byrnes stood so close that the plaintiff felt his erection; (4) Byrnes asked her out on dates to various establishments; (5) on one occasion, Byrnes said to the plaintiff, "[h]ey, since you're doing your college thing, I have Internet. You could come over on a Friday night since you don't have to work on a Saturday;" (6) and Byrnes sent her six notes, asking her out on

dates.  The plaintiff admits, however, that once she made it clear to Byrnes that she was not interested in him, he stopped his advances and sent her no more notes.[6]  Based on the facts of this case, the Court is of the opinion that, while some of Byrnes' conduct was offensive, it did not "rise to the level of severity or pervasiveness required by law." *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (citations omitted); *see also Stewart*, 586 F.3d at 330 (while conduct was offensive, it was not severe or threatening, and, as such, was "not the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace").

Indeed, the Fifth Circuit has found acts that were arguably similar to or more severe than those alleged in this case insufficient to create a hostile work environment because they did not rise to the level of severity or pervasiveness required by law.  *See e.g.*, *Hockman v. Westward Communications*, *LLC*, 407 F.3d 317, 321-322, 328 (5th Cir. 2004) (conduct was not severe where the alleged harasser: told the plaintiff that a co-worker had a "nice behind and body;" "grabbed or brushed" against the plaintiff's "breasts and behind" several times; "slapped [the plaintiff's] behind with a newspaper;" held the plaintiff's cheeks and attempted to kiss her; and on more than one occasion, he asked the plaintiff to come in early so that he could be alone with her); *Shepherd*, 168 F.3d at 874 (conduct was not pervasive or severe where the plaintiff's co-worker remarked, "[y]our elbows are the same color as your nipples;" said, "you have big

---

[6] The Court is of the opinion that the content of the notes was not severe or egregious.  For instance, in one note Byrnes said, "Good morning.  Hope you had a nice weekend.  At least know I thought about you."  In another note, Byrnes said, "Good morning.  So what are they saying about us?  I'm hardly even around you.  so I can't figure why they would say anything.  Do you want us to go out still?  Are you even attracted to me?  You did right to deny what they say.  If you want us to be together, don't bother with their drama."  In the other notes, which the plaintiff has not produced because she threw them away, Byrnes said, *inter alia*, "did you sleep ok?  I hope you slept ok;" "I sure wish you'd come see me;" "How do you feel about me?" " I miss you when you are gone."  Perhaps the strongest evidence that the content of the notes was not egregious is the plaintiff's own testimony where she acknowledges that she threw away most of the notes because they were "stupid" and dealt with "just juvenile stuff that you did in high school."

thighs" while he simulated looking under the plaintiff's dress; attempted to look down the plaintiff's dress on several occasions, and touched her arm, rubbing one of his hands from her shoulder down to her wrist); *Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825 (5th Cir. 2009) (no hostile work environment where a co-worker walked up to the plaintiff until his chest touched her breasts, placed his hand on the plaintiff's stomach and ran his arm around her waist, and "rubbed his pelvic region across [the plaintiff's] hips and buttocks"); *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (no hostile work environment where the plaintiff's supervisor "grabbed her on the buttocks and made suggestive comments" to her); *see also Barnett v. Boeing Co.*, 306 F. App'x 875, 876, 879-880 (5th Cir. 2009); *Derouen v. Carquest Auto Parts*, 275 F.3d 42 (5th Cir. 2001).

The plaintiff relies on the following cases to support her argument that Byrnes' conduct was sufficiently severe or pervasive to create a hostile work environment: *Alaniz v. Zamora-Quezada*, 591 F.3d 761 (2009), *Harvill v. Westward Comms.*, LLC, 433 F.3d 428 (5th Cir. 2005), *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), and *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1988).  Those cases however are distinguishable because they involved egregious and/or threatening or "chronic" conduct against the plaintiffs.  *See e.g., Waltman,* 875 F.2d at 470-471 (over 80% of the plaintiff's male co-workers made sexually suggestive comments to her and some propositioned her; the plaintiff's supervisor urged her to have sex with a co-worker, "pinched her buttocks with pliers," and tried to put his hands in her back pockets; the plaintiff received over thirty pornographic notes in her locker and many of the men left their lockers open with "pornographic pictures and used tampons;" and a co-worker told the plaintiff that "he would cut off her breast and shove it down her throat" and he later "dangled [the plaintiff] over a stairwell, more than thirty feet from the floor"); *Farpella-Crosby*, 97 F.3d at

805 (the plaintiff's supervisor made "frequent" comments attributing her large number of children to "a proclivity to engage in sexual activity;" joked to co-workers that the plaintiff "d[idn't] know how to use condoms;" "frequently" inquired about the plaintiff's sexual activity; and "threatened" the plaintiff's "job on numerous occasions when she asked him to stop making" the comments); *Harvill*, 433 F.3d at435-436 (during a seven-month period, despite the plaintiff's protests, the alleged harasser grabbed her and kissed her on the cheek, "popped rubber bands at her breasts," fondled her breasts "numerous times," and patted her on her buttocks "numerous times").

## B.    Retaliation

The Court is of the opinion that summary judgment is also appropriate on the plaintiff's retaliation claim. To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *See Stewart*, 586 F.3d at 331. "If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate ... non-retaliatory reason for its employment action." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008) (citations omitted). If the employer meets its burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretextual. *Id.*

Lifechek claims that the plaintiff cannot satisfy the third element of her *prima facie* case, *i.e.*, that a causal link exists between the protected activity and the adverse employment action. The plaintiff, on the other hand, claims that she has satisfied the third element. Furthermore, the plaintiff assumes, for the purpose of this motion, that Lifechek has articulated a legitimate, non-discriminatory reason for her termination, *i.e.*, her unsatisfactory work performance, but she

argues that the reason is pretextual.  Therefore, based on the parties' arguments, the Court will determine whether Lifechek has provided a legitimate, non-discriminatory reason for terminating the plaintiff and whether the plaintiff has established that the reason is pretextual.

Preliminarily, although the plaintiff claims that her hours were reduced after she filed her EEOC charge, she has provided no competent summary judgment evidence to support that allegation.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'").  The plaintiff also claims that other employees "began freezing her out" and not speaking to her, and Byrnes and some employees made "snide remarks" to her. "As a matter of law," however "these allegations do not rise to the level of material adversity but instead fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct." *Stewart*, 586 F.3d at 321 (the plaintiff's allegations that she was, *inter alia*, "chastised by superiors and ostracized by co-workers" amounted to "petty slights, minor annoyances, and simple lack of good manners" and were not actionable retaliatory conduct).

In any event, Lifechek has produced a legitimate, nonretaliatory reason for terminating the plaintiff.  Lifechek specifically notes that the plaintiff received nine written warnings for work quality and, despite several suspensions and warnings that she would be fired if she did not improve, the plaintiff failed to improve her work performance.  Indeed, the plaintiff has assumed that Lifechek has produced a legitimate reason for terminating her.  *See Arensdorf v. Snow*, No. H-05-2622, 2006 WL 3302532, at *15 (S.D. Tex. Nov. 13, 2006) (poor performance is a legitimate, nonretaliatory reason for adverse employment action), *aff'd,* 259 F. App'x 639 (5th Cir. 2007).

Having determined that Lifechek has produced a valid, nonretaliatory reason for terminating her, the burden rests squarely on the plaintiff to establish that the reason is a pretext for retaliation. *See Aryain*, 534 F.3d at 484. To carry her ultimate burden, the plaintiff must show that the adverse action (her termination) would not have occurred but for her protected activity. *See Strong v. Univ. Healthcare Sys.*, L.L.C., 482 F.3d 802, 806 (5th Cir. 2007); *see also Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 143 (2000) (a plaintiff may show pretext by producing evidence of disparate treatment or evidence that the proffered explanation is "false" or "unworthy of credence").

The plaintiff has presented a number of arguments in an attempt to establish that Lifechek's reason for terminating her was pretextual. The Court, however, finds the plaintiff's arguments unpersuasive.

To the extent the plaintiff is now disputing the underlying conduct in her written reprimands, her argument fails because the plaintiff, who had the ability to dispute the write-ups when they were issued, admits that she signed every one of them, did not dispute that she actually made the mistakes, and did not check the box in the write-ups stating that she disagreed with them. Therefore, her belated attempt at disputing the write-ups is unpersuasive. In any event, merely disputing the employer's assessment of the plaintiff's work performance "will not necessarily support an inference of pretext." *Shackelford v. Deloitte & Touche*, LLP, 190 F.3d 398, 405 (5th Cir. 1999); *see also Love v. Motiva Enterprises LLC*, 349 F. App'x 900, 905 (5th Cir. 2009) (although the plaintiff disputed the accuracy of the defendant's evidence, the courts "do not second-guess an employer's non-discriminatory assessment of an employee's performance").

The plaintiff also asserts that Amanda Ward, a co-worker, overheard Amber Klawinsky, a technician, tell Tina Walker, the head technician, that the plaintiff "may" get fired because of her EEOC complaint.  Problems of hearsay aside, the alleged statement is insufficient to establish, "at a new level of specificity" that Lifechek's reason is pretextual.  *Harris v. First American Nat. Bancshares, Inc*., 484 F. App'x 902, 904 (5th Cir. 2012).

According to the plaintiff, during her initial meeting with management to investigate her EEOC charge, corporate trainer Sandra Scott remarked, "I don't remember having anybody file an EEOC charge and still work here."  That statement, however, does not establish that Lifechek intended to retaliate against the plaintiff.  Rather, the statement can equally mean that employees who file EEOC complaints against a company sometimes decide not to continue working at the company, given that such complaints usually make the environment uncomfortable for both parties (employer and employee).  Since the comment is subject to more than one reasonable interpretation, the Court is of the opinion that it is insufficient to establish pretext.  *Cf. Moss v. BMC Software, Inc*., 610 F.3d 917, 929 (5th Cir. 2010) (albeit dealing with an age discrimination claim, the Fifth Circuit noted that in order for a comment to be probative of an employer's discriminatory intent, "it must be direct and unambiguous").  In fact, Norma Todd, one of the plaintiff's co-worker, who is also a plaintiff in this case, continues to work for Lifechek even after she filed an EEOC charge.

The plaintiff also alleges that she was "informed" by Scott Younker, Director of Operations, "about how much this was going to cost and why don't I just drop all of this and they'll take care of it."  That statement is also not a "direct and unambiguous" statement of an intent to retaliate.  *Cf. Moss*, 610 F.3d at 929.  Indeed, rather than indicating an intent to retaliate, the statement may simply indicate an attempt or desire by Lifechek to amicably resolve the

matter.   Notably, as a result of Lifechek's investigation, Bob Byrnes was given a written reprimand for breaking company policy on fraternization and he was warned that any other violations would result in further disciplinary action, including termination.  Shortly, thereafter, Byrnes was terminated as a result of a complaint filed by another plaintiff in this case.   The prompt and remedial actions taken by Lifechek are not consistent with a company that retaliates against its employees for filing EEOC charges.

The plaintiff, relying on a declaration provided by Amanda Ward, a former pharmacy manager at Lifechek, claims that management instructed Ward to only write her up and forced Ward to give her a write-up for a minor mistake.  Significantly, however, Ward acknowledges that the plaintiff actually made a mistake, though Ward considered it to be "minor."  Moreover, the plaintiff received several write-ups that were not issued by Ward and, as noted, the plaintiff who had the ability to dispute the write-ups when they were issued, did not dispute that she actually made the mistakes and she signed every one of them.  Therefore, under these facts, the plaintiff's reliance on the declaration of Ward, who, for unknown reasons, no longer works for Lifechek, is insufficient to create an issue of fact regarding pretext.

According to the plaintiff, Lifechek created a paper trail, *i.e.*, the write-ups, in order to terminate her.  The plaintiff's argument is unpersuasive for two reasons.  First, the plaintiff does not dispute that in December of 2009, before Lifechek learned of her EEOC charge,[7] she was given two write-ups, one for cash register shortage, and the other for engaging in a confrontation with a customer.  She acknowledges that she signed both warnings and did not disagree with them at the time.  Therefore, since the plaintiff had job performance problems and received

---

[7]The plaintiff acknowledges that Lifechek first learned of the charge in January of 2010.  Of course, "[i]f an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."  *Gollas v. Univ. Of Texas Health Sci. Ctr. At Houston*, 425 F. App'x 318, 325 (5th Cir. 2011) (citations omitted).

write-ups before Lifechek learned of her EEOC charge, her argument that the company started creating a paper trial to terminate her after it learned of the charge, is unpersuasive. Secondly, as noted, even with respect to the write-ups that were issued after the company learned of her EEOC charge, the plaintiff did not dispute them when they were issued, she did not dispute that she actually made the mistakes, and she signed every one of the write-ups.[8]

In essence, the plaintiff has not established "at a new level of specificity" that Lifechek's reason for terminating her (her well-document unsatisfactory work performance) was a pretext for retaliation. *Harris*, 484 F. App'x at 904 (5th Cir. 2012) (the plaintiff must show "at a new level of specificity" that the employer's reason was pretextual); *see also Reeves*, 530 U.S. at 143 (a plaintiff may show that the employer's nondiscriminatory reason was pretextual by producing evidence of disparate treatment or evidence that the proffered explanation is "false" or "unworthy of credence").

## C.   DEFAMATION

The plaintiff's defamation claim appears to be based on her allegations that "it's amazing that I do have qualifications and the only job I can get that would call me back was when Norma [Todd] helped me get a job at Leroy's waiting tables. Everywhere else I applied, they weren't

---

[8]The plaintiff also alleges that, following her discrimination complaints, Lifechek instituted a policy whereby employees could be disciplined for gossiping and that a "reasonable fact finder could determine that this policy in and of itself was retaliatory giving the timing of its implementation, coupled with the fact that under this policy an employee is potentially subject to discipline for discussing allegations of sexual harassment." Thus, the plaintiff asserts that, based on "the implementation of this retaliatory policy, one could conclude that Lifechek had the motive or intent to terminate [her] as a result of her sexual harassment complaint/EEOC charge." The Court finds the plaintiff's argument unpersuasive. For one thing, Lifechek has noted that, contrary to the plaintiff's assertion, the policy was not implemented in 2010 but, rather, was actually in place and part of the Employee Handbook since as early as 2006, three years before the plaintiff began working at the company, and the policy was simply reiterated to the employees in 2010. In any event, even assuming the policy was implemented in 2010, the plaintiff does not specifically claim or establish that the policy negatively affected her. Furthermore, Lifechek took prompt remedial actions after it became aware of the plaintiff's EEOC charge. Bob Byrnes was given a written reprimand for breaking company policy on fraternization and he was warned that any other violations would result in further disciplinary action, including termination. Shortly, thereafter, Byrnes was terminated as a result of a complaint filed by another plaintiff in this case.

hiring" and "it just seemed a little suspicious."  In other words, the plaintiff's defamation claim is based on her "little suspici[on]" that Lifechek may have given her unfavorable recommendations.

Lifechek argues that the plaintiff's claim is "speculative" and she has failed to establish that the company published a defamatory statement about her to a third party, an essential element of a defamation claim.  The plaintiff has failed to address Lifechek's argument in her response.   Therefore, Lifechek's argument, which is based on the plaintiff's deposition testimony, remains unchallenged and undisputed.  *Cf. Jegart v. Roman Catholic Church of Houma . . .*, 384 Fed.Appx. 398, 400 (5th Cir. 2010) (when a party fails to file an opposition, the court is permitted to consider the facts listed in support of the motion as undisputed).  Accordingly, the plaintiff's defamation claim fails as a matter of law.

## VI.    CONCLUSION

Based on the foregoing discussion, the Court finds that the plaintiff has failed to establish the fourth element of her sexual harassment claim, *i.e.*,  that the alleged harassment affected a "term, condition, or privilege" of employment.  The plaintiff's retaliation claim also fails because she has failed to establish that Lifechek's reason for terminating her was pretextual.  Moreover, the plaintiff has failed to respond to Lifechek's argument that her defamation claim fails as a matter of law.  Therefore, the Court GRANTS Lifechek's motion for summary judgment in its entirety.

It is so **ORDERED**.

SIGNED on this 30th day of May, 2013.

Kenneth M. Hoyt
United States District Judge