UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHY ST.CLAIR-SEARS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-52 |
| | § | |
| LIFECHEK STAFF SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Pending before the Court are the defendant's, Lifechek Staff Services, Inc., ("Lifechek"), motion for summary judgment (Docket No. 31), the plaintiff's, Rose Giovannelli (the "plaintiff"), response (Docket No. 52), and Lifechek's reply (Docket No. 62).  Having carefully reviewed the parties' submissions, the record and the applicable law, the Court hereby GRANTS Lifechek's motion for summary judgment.[1]

**II.   FACTUAL BACKGROUND**

The plaintiff worked as a cashier for Lifechek from September 2008 to June 2009, and then from August to October of 2009.  She claims that she was sexually harassed by her supervisor, store manager Bob Byrnes.  According to the plaintiff, shortly after she started working in September of 2008, Byrnes told her to "put [her] name tag on [her] tit so it bounces up and down" when she walks.  The plaintiff claims that she was "speechless" and did not respond to Byrnes.  She alleges that she told her co-workers about Byrnes' comment and they responded, "[t]hat's just how Bob is."

---

[1] Lifechek has filed separate motions with respect to each plaintiff and the plaintiffs have filed separate responses.  Therefore, the Court will issue separate decisions.

The plaintiff asserts that at least once a week Byrnes made inappropriate sexual comments in her presence. She specifically claims that Byrnes told her he wanted to take various female customers home and have sex with them. The plaintiff acknowledges that she did not ask Byrnes to stop making the comments, but claims that she discussed them with her co-workers and her parents. She alleges that her mother told her to find out whom to report the inappropriate comments to, but she admits that she never did. The plaintiff also asserts that she did not receive any sexual-harassment training during her employment and did not know whom to speak with at the corporate office regarding a workplace complaint.[2]

According to the plaintiff, on a weekly basis, Byrnes came behind her and stood so close that she could feel him breathing on her neck. She alleges that Byrnes' conduct made her a "little uncomfortable." The plaintiff acknowledges that she did not say anything to Byrnes about his conduct because "I thought I was doing something wrong or wasn't . . . counting [the money from the cash register] the way I was supposed to and so [Byrnes] was just kind of supervising what I was doing. But looking back on it . . . it wasn't appropriate and it did make me feel uncomfortable." She also claims that Byrnes stared at her breast, vagina, and buttocks. The plaintiff further alleges that Byrnes massaged her shoulders once or twice, but she did not say anything to him about it and did not report it to her co-workers or anyone else.

The plaintiff resigned in June of 2009 because she was not able to find a ride to work. She acknowledges that her resignation had nothing to do with Byrnes' alleged conduct. A

---

[2] The plaintiff also claims that she does not recall receiving an employee handbook during her employment, but acknowledges that it is "possible" that she did. However, the plaintiff's deposition testimony regarding the employee handbook is contradictory. She initially stated that "I know I did receive an employee handbook. I just don't remember the specific time or day that I got it." Indeed, she acknowledged that she may have "flipped through" the handbook. Later, in her testimony, however, she claimed that she did not remember receiving the handbook, but it was possible that she did. Furthermore, the plaintiff acknowledges that she saw a poster regarding certain employee rights at work, but claims that the poster only discussed minimum wage "and things like that; but I can't recall anything about who to go to with a complaint."

couple of months later, the plaintiff was approached by a former co-worker about returning to Lifechek and she agreed. She was rehired in August of 2009.

The plaintiff asserts that Byrnes' sexual harassment continued when she was rehired. Specifically, she claims that while she, Byrnes, and a co-worker were processing pictures, she heard Byrnes say "something about breasts" but did not hear what Byrnes had actually said. The plaintiff claims that she said, "I'm sorry. What?" and the co-worker responded, "He [Byrnes]'s talking about your big boobs." The plaintiff did not say anything to Byrnes about the alleged statement. She also acknowledges that she did not report the incident, though she claims that she did not know whom to report it to.[3]

According to the plaintiff, she decided to resign based on the latest incident involving Byrnes. She claims that a few weeks before she resigned, however, Byrnes became rude to her. She alleges that Byrnes "talked down" to her and made her cry in front of customers. The plaintiff claims that one day she was processing a picture and "may have messed up" and Byrnes became furious with her. She called her father to pick her up and resigned.

On January 20, 2010, several months after resigning, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Agency and the Texas Workforce Commission, alleging sexual harassment and retaliation. Subsequently the plaintiff filed the instant suit, raising the same claims.

## III. CONTENTIONS OF THE PARTIES

### A. Lifechek's Contentions

Lifechek argues that the plaintiff's sexual harassment claim fails as a matter of law because she cannot prove the fourth element of a hostile work environment, *i.e.*, that the alleged

---

[3] When asked why she had not done what her mother had asked her to do, namely find out whom to report workplace complaints to, the plaintiff responded that she did not do so because she was planning on resigning.

harassment affected a term, condition, or privilege of her employment. Lifechek specifically claims that the alleged harassment was isolated and was not "so severe" or "pervasive that it destroy[ed]" the plaintiff's "opportunity to succe[ed] in the work place."

Lifechek also contends that the retaliation claim fails because the plaintiff has not established that she engaged in protected conduct and she suffered no adverse employment action.

### B. The Plaintiff's Contentions

The plaintiff argues that the sexual harassment she experienced was not isolated, but transpired on an ongoing basis during her employment. She also contends that her young age (she was sixteen at the time) should be considered when determining whether the conduct at issue amounted to sexual harassment.

The plaintiff further argues that her retaliation claim should proceed because she can establish an adverse employment action, *i.e.*, that she was constructively discharged. She does not address Lifechek's argument that she did not engage in protected conduct.

### IV. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c). "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322–25 (1986). Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See*

*Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. FED. R. CIV. P. 56(e). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625. "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004). Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251–52).

V.   **ANALYSIS AND DISCUSSION**

Under the Civil Rights Act of 1964 ("Title VII"), it "shall be . . . unlawful . . . for an employer . . . to discharge any individual or otherwise to discriminate . . . with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, under the Texas Commission on Human Rights Act ("TCHRA"), it is unlawful for an employer to engage in sexual harassment and/or retaliate against an employee based on sex. *See* Tex. Lab. Code §§ 21.051; 21.055. The legal analysis for Title VII and TCHRA claims are identical and, therefore, the courts apply the legal standards

developed by the federal courts to resolve the claims. *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010).

**A.     Sexual Harassment.**

To establish a hostile work environment under Title VII, the plaintiff must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a "term, condition, or privilege" of employment. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009).

In this case, Lifechek does not dispute that the plaintiff can satisfy the first three elements. Lifechek argues, however, that the plaintiff cannot establish the fourth element, *i.e.*, that the alleged harassment affected a "term, condition, or privilege" of her employment. The Court agrees that the plaintiff has failed to satisfy the fourth element because the alleged conduct at issue was not sufficiently severe or pervasive as required by law.

To affect a term, condition, or privilege of employment, "sexual harassment must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Stewart*, 586 F.3d at 330 (citations omitted). "A recurring point in [Supreme Court] opinions is that . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999). To determine whether conduct is severe or pervasive, the Court should look at the totality of the circumstances. *See Stewart*, 586 F.3d at 330. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Id.* Finally, to be actionable, the challenged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd*, 168 F.3d at 874.

In this case, the plaintiff claims that: (1) Byrnes told her to "put [her] name tag on [her] tit so it bounces up and down" when she walks; (2) Byrnes made inappropriate sexual comments in the plaintiff's presence, *i.e.*, that he wanted to take various female customers home and have sex with them; (3) Byrnes came up behind the plaintiff and stood so close that she could feel him breathing on her neck and he also rubbed her shoulders; (4) Byrnes stared at her breast, vagina, and buttocks; and (5) while the plaintiff, Byrnes, and another employee were processing pictures, the plaintiff heard Byrnes mention breasts, but did not hear exactly what Byrnes had said, and when she asked "what was that?" the other employee (not Byrnes) responded, "He [Byrnes is] talking about your big boobs."

The Court is of the opinion that the alleged acts and statements by Byrnes were "boorish and offensive" but did not "rise to the level of severity or pervasiveness required by law." *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (citations omitted); *see also Stewart*, 586 F.3d at 330 (while the conduct was offensive, it was not severe or threatening, and, as such, was "not the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace").

In fact, the Fifth Circuit has found acts that were arguably similar to or more severe than those alleged in this case insufficient to create a hostile work environment because they did not rise to the level of severity or pervasiveness required by law. *See e.g., Hockman v. Westward Communications, LLC*, 407 F.3d 317, 321-322, 328 (5th Cir. 2004) (conduct was not severe

where the alleged harasser: told the plaintiff that a co-worker had a "nice behind and body;" "grabbed or brushed" against the plaintiff's "breasts and behind" several times; "slapped [the plaintiff's] behind with a newspaper;" held the plaintiff's cheeks and attempted to kiss her; and on more than one occasion, he asked the plaintiff to come in early so that he could be alone with her); *Shepherd*, 168 F.3d at 874 (conduct was not severe or pervasive where the plaintiff's co-worker remarked, "Your elbows are the same color as your nipples;" said, "you have big thighs" while he simulated looking under the plaintiff's dress; attempted to look down the plaintiff's dress on several occasions, and touched her arm, rubbing one of his hands from her shoulder down to her wrist); *Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825 (5th Cir. 2009) (no hostile work environment where a co-worker walked up to the plaintiff until his chest touched her breasts, placed his hand on the plaintiff's stomach and ran his arm around her waist, and "rubbed his pelvic region across [the plaintiff's] hips and buttocks"); *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (no hostile work environment where the plaintiff's supervisor "grabbed her on the buttocks and made suggestive comments" to her); *see also Barnett v. Boeing Co.*, 306 F. App'x 875, 876, 879-880 (5th Cir. 2009); *Derouen v. Carquest Auto Parts*, 275 F.3d 42 (5th Cir. 2001).

The plaintiff relies on the following cases to support her argument that Byrnes' conduct was sufficiently severe or pervasive to create a hostile work environment: *Alaniz v. Zamora-Quezada*, 591 F.3d 761 (2009), *Harvill v. Westward Comms.*, LLC, 433 F.3d 428 (5th Cir. 2005), *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), and *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1988). Those cases however are distinguishable because they involved egregious and/or threatening or "chronic" conduct against the plaintiffs. *See e.g., Waltman,* 875 F.2d at 470-471 (over 80% of the plaintiff's male co-workers made sexually

suggestive comments to her and some propositioned her; the plaintiff's supervisor urged her to have sex with a co-worker, "pinched her buttocks with pliers," and tried to put his hands in her back pockets; the plaintiff received over thirty pornographic notes in her locker and many of the men left their lockers open with "pornographic pictures and used tampons;" and a co-worker told the plaintiff that "he would cut off her breast and shove it down her throat" and he later "dangled [the plaintiff] over a stairwell, more than thirty feet from the floor"); *Farpella-Crosby*, 97 F.3d at 805 (the plaintiff's supervisor made "frequent" comments attributing her large number of children to "a proclivity to engage in sexual activity;" joked to co-workers that the plaintiff "d[idn't] know how to use condoms;" "frequently" inquired about the plaintiff's sexual activity; and "threatened" the plaintiff's "job on numerous occasions when she asked him to stop making" the comments); *Harvill*, 433 F.3d at 435-436 (during a seven-month period, despite the plaintiff's protests, the alleged harasser grabbed her and kissed her on the cheek, "popped rubber bands at her breasts," fondled her breasts "numerous times," and patted her on her buttocks "numerous times").

The plaintiff also contends that her young age (she was sixteen at the time) should be considered when determining whether Byrnes' conduct amounted to sexual harassment in this case. While it is unfortunate that the sixteen-year-old plaintiff was subjected to Byrnes' "boorish" conduct, and while the conduct may have been "subjectively offensive" to the plaintiff, the law also requires the conduct to be "objectively offensive" and, as discussed above however, Byrnes' conduct did not "rise to the level of severity or pervasiveness required by law." *Gibson*, 264 F. App'x at 398; *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (the Supreme Court noted that, "[p]rocedural requirements established by Congress for

gaining access to the federal courts are not to be disregarded by courts out of . . . sympathy for particular litigants").

**B.     Retaliation.**

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *See Stewart*, 586 F.3d at 331.  Summary judgment is appropriate if the plaintiff is unable to satisfy any of the aforementioned three elements. *Id.*

The Court is of the opinion that the plaintiff cannot establish retaliation because she did not engage in activity protected by Title VII while she was employed at Lifechek and she was not subjected to an adverse employment action.

An employee has engaged in activity protected by Title VII if she has either: (a) "opposed any practice made an unlawful employment practice" by Title VII; or (b) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 492 (5th Cir. 2011).

In this case, Lifechek argues that the plaintiff's testimony confirms: (1) she did not file an EEOC charge while employed at the company;[4] (2) did not make a complaint or report to any managerial agent of the company about any alleged discrimination or discriminatory harassment; (3) she did not speak out against any discriminatory practices; or (4) participate in any investigations.  The plaintiff has failed to address Lifechek's argument in her response. Therefore, Lifechek's argument, which is based on the plaintiff's deposition testimony, remains

---

[4] Indeed, the evidence establishes that the plaintiff filed her EEOC charge on January 20, 2010, several months after she resigned from Lifechek.

unchallenged and undisputed. *Cf. Jegart v. Roman Catholic Church of Houma . . .* , 384 Fed.Appx. 398, 400 (5th Cir. 2010) (when a party fails to file an opposition, the court is permitted to consider the facts listed in support of the motion as undisputed). Since the plaintiff has failed to establish the first element of her retaliation claim, *i.e.*, that she engaged in protected activity, her claim fails as a matter of law. *See Stewart*, 586 F.3d at 331 (summary judgment is appropriate if the plaintiff is unable to satisfy any of the three elements of her retaliation claim).

The plaintiff has also failed to establish that she was constructively discharged.[5] Demonstrating constructive discharge "imposes a high burden" upon the employee. *Robinson v. Waste Management of Texas*, 122 F. App'x 756, 758 (5th Cir. 2004). To meet that burden, the employee "must offer evidence that the employer made [her] working conditions so intolerable that a reasonable employee would feel compelled to resign." *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000). The "subjective state of mind of the employee is irrelevant." *Robinson*, 122 F. App'x at 758. Rather, the test is a "reasonable employee" test and the court can find in favor of the plaintiff only if she shows that the decision to stop working was "reasonable under all the circumstances." *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 650 (5th Cir. 2004); *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Moreover, the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008).

Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but a court should consider the following factors "singly or in combination": (1)

---

[5]It is not clear whether the plaintiff is arguing "constructive discharge" as an independent claim or as an alternative way to satisfy the second element of her retaliation claim, *i.e.*, she was subjected to an adverse employment action. Either way, the claim fails.

demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement. *Brown*, 207 F.3d at 782.

In this case, the plaintiff worked as a cashier for Lifechek from September of 2008 until she resigned in June of 2009. She was then rehired from August of 2009 until she resigned again in October 2009. It is not clear whether the plaintiff is claiming that she was constructively discharged during her first period of employment. To the extent that she is, that argument is unpersuasive because she admits that she resigned in June of 2009 because she was not able to find a ride to work and that her resignation had nothing to do with Byrnes' alleged conduct. Therefore, the Court will only consider whether the plaintiff was constructively discharged when she resigned in October of 2009, during her second period of employment.[6]

The plaintiff claims that during her second period of employment, from August to October of 2009, while she, Byrnes, and another co-worker were processing pictures, she heard Byrnes say "something about breasts" but did not hear what Byrnes had actually said. The plaintiff claims that she said, "I'm sorry. What?" and the co-worker (not Byrnes) responded, "He [Byrnes]'s talking about your big boobs." According to the plaintiff, she decided to resign based on this one incident. She claims that a few weeks before she resigned, however, Byrnes became rude to her. Specifically, the plaintiff asserts that one day she was processing a picture and "may have messed up" and Byrnes became furious with her. As a result, the plaintiff resigned in October of 2009.

---

[6] Even if this Court were to consider the plaintiff's resignation in June of 2009, it would find that, under the facts of this case, she has failed to meet her "high burden" of showing that Lifechek "made [her] working conditions so intolerable that a reasonable employee would feel compelled to resign." *Brown*, 207 F.3d at 782; *Robinson*, 122 F. App'x at 758-759.

The Court is of the opinion that the plaintiff was not constructively discharged when she resigned in October of 2009. The plaintiff was not demoted, her salary was not reduced, her job responsibilities were not reduced, and she was not reassigned to "menial or degrading work." The alleged statement by Byrnes, which the plaintiff admits she did not hear from Byrnes, but was repeated to her by a co-worker, and the fact that Byrnes allegedly became "furious" with her because she "may have messed up" a picture, are insufficient to satisfy the plaintiff's "high burden" of showing that the "working conditions [were] so intolerable that a reasonable employee would feel compelled to resign." *Brown*, 207 F.3d at 782; *Robinson*, 122 F. App'x at 758-759; *see also Barrow*, 10 F.3d at 297 (the employee must establish that the decision to stop working was "reasonable under all the circumstances"); *Stover*, 549 F.3d at 991 (the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment").

## VI.   CONCLUSION

Based on the foregoing discussion, the Court finds that the plaintiff has failed to establish the fourth element of her sexual harassment claim, *i.e.*, that the alleged harassment affected a "term, condition, or privilege" of employment. The plaintiff's retaliation claim also fails because she has failed to demonstrate that she engaged in activity protected by Title VII and/or that she was constructively discharged. Therefore, the Court GRANTS Lifechek's motion for summary judgment in its entirety.

It is so **ORDERED**.

SIGNED on this 30th day of May, 2013.

_____
Kenneth M. Hoyt
United States District Judge